UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| MANNY IRON HAWK, RENEE IRON HAWK, SULLIVAN WHITE WOLF, and MICHELLE WHITE WOLF,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | CIV. 19-5080-JLV<br><br>ORDER |

**INTRODUCTION**

Defendant United States of America filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1).  (Docket 5).  The motion is accompanied by a legal memorandum, two declarations and an exhibit.  (Dockets 6, 7, 7-1 & 8). Plaintiffs oppose defendant's motion.  (Docket 14).  Plaintiffs' response is supported by four affidavits and two exhibits.  (Dockets 14-1 through 14-6). Defendant filed a reply brief supported by three declarations.  (Dockets 21-24). For the reasons stated below, defendant's motion to dismiss is granted.

**ANALYSIS**

Plaintiffs' claims center around the removal of horses from their leased range units with the Cheyenne River Sioux Tribe.  (Docket 1 ¶¶ 2-3 & 6). Plaintiffs allege individuals employed by the Department of Interior, Bureau of Indian Affairs ("BIA"), Cheyenne River Agency, Branch of Land Operations, on

August 23, 2016, "carelessly ran horses belonging to the plaintiffs in a reckless and cruel manner around and off the pasture." Id. ¶¶ 5 & 6. As a result of BIA's employees' conduct, plaintiffs allege they "suffered loss of horses, veterinarian expenses for traumatized and injured horses, damage to lands, damage to forage, inconvenience and loss of time dealing with the trespassing and damages, psychological and emotional damage, aesthetic damages to land, as well as future repairs and maintenance." Id. ¶ 9. Plaintiffs seek a money judgment against the government. Id. ¶ 13.

The government filed a motion to dismiss plaintiffs' complaint pursuant to Rule 12(b)(1). (Docket 5). The government seeks dismissal because the members of "the roundup crew were not federal employees, but rather independent contractors operating under individual contracts between themselves and the Cheyenne River Agency of the BIA." (Docket 6 at p. 2). For this reason, the government asserts "dismissal of this action is required because Plaintiffs cannot show any negligence by a federal employee as is necessary to impose tort liability on the United States under the FTCA [Federal Tort Claims Act]." Id.

In support of its' motion to dismiss, the government produced the contracts for services of nine "local riders to round up the horses[.]" (Docket

7 ¶¶ 3 & 7) (referencing Docket 7-1). Each contract for services contained the same language.[1]

    1.    Scope of Work.

Starting at 6:00 a.m. MST on Monday, August 22, 2016 and ending on or about Friday, August 26, 2016, or when the final horse is gathered, the parties hereby agree to the following terms and conditions:

    a.    I agree that I am responsible for the round up and delivery of all of the horses that are identified as being in trespass on or originating from Range Unit #154.

    b.    I understand that there are approximately ninety (90) head of horses, more or less, in trespass on or originating from Range Unit #154.

    c.    I agree that I am responsible for providing all equipment required for the round up and delivery of said horses to the Philip Sale Barn located in Philip, South Dakota.

    d.    I agree that the equipment required for the round up and delivery of said horses includes, but is not limited to, trucks, pickups, all-terrain vehicles, panels, horses, and loading chutes.

    e.    I agree that I am personally liable for any property damage as a result of the round up and delivery of said horses.

    f.    I agree that I am personally liable for any personal injury as a result of the round up and delivery of said horses.

    g.    I will hold harmless the United States for any property damage or personal injury as a result of the round up and delivery of said horses.

---

[1]The court will use the language from only one of the contracts unless otherwise noted.

3

    h.     I agree that I am responsible for my own fuel and maintenance of any vehicle and any personal property used in the round up and delivery of said horses.

. . .²

    j.     The BIA agrees to provide administrative support services in order to control and address questions from onlookers and those claiming to be the livestock owner(s).

    k.     The BIA agrees to assist with any administrative concerns.

(Docket 7-1 at p. 1) (bold and underlining omitted). The contract provided that "[u]pon satisfactory completion of the aforementioned services" each rider would be paid $1,875.³  Id. at p. 2.

Originally "[t]he BIA contracted with eight local riders to round up [approximately 70] horses" on "Range Unit 154 [which] was allocated to Manny and Renee Iron Hawk." (Docket 7 ¶¶ 2 & 3). Lonnie Wright, the "Realty Officer with the Cheyenne River Agency . . . mistakenly believed [Kelan Gesinger] was part of the original round up crew" so all 'nine riders (including Gesinger) signed contracts . . . on August 22, 2016[.]" Id. ¶¶ 1, 6 & 7.

---

²Subparagraph (i) in the first eight contracts was struck in rough penmanship, apparently by each of the riders, but (i) was not struck in the contract of Kelan Gesinger.  Compare Docket 7-1 at pp. 1, 3, 5, 7, 9, 11, 13 & 15 with Docket 7-1 at p. 17.  Subparagraph (i) in Mr. Gesinger's contract was not stricken.  (Docket 7-1 at p. 17).  It stated "I agree that I am responsible for any damages to border fences and improvements located on Range Unit #154 and surrounding Range Units as a result of the round up and delivery of said horses."  Id.

³"The BIA disapproved Kelan Gesinger's contract and did not issue payment to him."  (Docket 7 ¶ 8).

"Because of the dangerous riding conditions due to the terrain and wild horses, BIA employees did not participate in the actual roundup, but [Mr. Wright] was present at Range Unit 154 during the roundup." Id. ¶ 4. "When the roundup crew went to gather the horses, there were not many horses in Range Unite 154. . . . The crew rounded up 14 horses."[4] Id. ¶ 9. "Five horses jumped the fence into Range Unit 67, which was allotted to Ted Knife." Id.

"The next morning . . . August 23, 2016, the roundup crew, minus Gesinger, arrived . . . to round up the remaining horses in Range Unit 154." Id. ¶ 10.[5] When Mr. Gesinger and Kolby Longbrake "showed up at 9:00 a.m. . . . [Gesinger] appeared to be under the influence of drugs and was told to leave."[6] Id. ¶ 11. Later on the morning of August 23, "the BIA decided to cease the impoundment and return all captured horses to Plaintiff Manny Iron

---

[4]Mr. Wright's declaration makes additional statements which are opinions or are not made on personal knowledge. Those matters will not be considered by the court. See Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."). Similarly, statements of the other declarants will not be considered if the testimony is not based on personal knowledge.

[5]The drafter of Mr. Wright's declaration mistakenly started over with the numbering of the paragraphs. The court identifies this paragraph as 10 and will consider each subsequent paragraph in numerical sequence.

[6]Mr. Longbrake was not a contract rider and because of later statements by plaintiff Sullivan White Wolf, the court assumes Mr. Longbrake left with Mr. Gesinger.

Hawk."  Id. ¶ 12.  "The BIA also decided to use the [eight] contract riders to retrieve the five horses that had jumped into Range Unit 67."  Id.

"Just before 9:00 a.m. on . . . August 25 . . . [Mr. Wright] was meeting with BIA Superintendent Gregg Bourland, BIA Acting Land Operations Officer Jeri Vines and BIA Deputy Superintendent Gina Douville."  Id. ¶ 15.  During the meeting, Mr. Bourland got a call from Sullivan White Wolf.  Id.  Mr. Wright and BIA Range Technician Kenny Traversie went to Range Unit 23.  Id. ¶ 16.  On that range unit, they "saw three groups of horses . . . totaling rough 20 head . . . [some of which Mr. Wright] recognized . . . from the round up earlier in the week on Range Unit 154."  Id.

While they were visiting, Mr. White Wolf "explained that Kelan Gesinger was chasing horses on [Mr. White Wolf's] range unit, running them through fences, and taking them westward."  Id. ¶ 17.  Mr. White Wolf "stated that three head had been injured and that some had been killed."  Id.  He showed Mr. Wright and Mr. Traversie "the general location of the injured horses[, and] . . . accused the BIA of sending Gesinger to round up [Mr. White Wolf's] horses."  Id.

As the three men were visiting, a pickup and flatbed trailer came down the road.  Id. ¶ 19.  Mr. White Wolf declared that if "there is a motorcycle tied to the flatbed[,] Kelan is in [the pickup]."  Id.  As the pickup passed them, Mr. Wright "saw a motorcycle tied on the back of the flatbed" and "attempted to waive the pickup down, but it did not stop."  Id.

6

Later on August 25, Mr. Wright went back to Range Unit 23 to photograph any dead or injured horses.  Id. ¶ 21.  He saw no dead horses, but observed "an injured colt who was laying down, a bay mare who was limping, and a bay colt laying down who would get up, walk a few steps, and then act as though his feet hurt."  Id.

During the day on August 25 "the [eight] contract riders . . . went to Range Unit 67 and retrieved three of the horses . . . [but] could not locate the other two horses that had jumped the fence into that range unit[.]"  Id. ¶ 13.  "The BIA did not tell the contract riders to go to the White Wolf Range Unit 23 and [the eight contract riders] did not go there."  Id. ¶ 14.  Mr. Wright did not instruct Mr. Gesinger to go to Range Unit 23 or attempt to round up Mr. White Wolf's horses.  Id. ¶ 18.  According to Mr. Wright, Mr. Gesinger "acted on his own initiative[.]"  Id.

About 3 p.m. on August 25, the eight contract riders went to Mr. Bourland's office to be paid.  (Docket 8 ¶ 9).   While five of the riders were still present, "a young man appeared at [the] door[.]"  Id.  When Mr. Bourland asked the young man's name, he replied "John."  Id.  Because the other "riders were shaking their heads," Mr. Bourland again asked the young man his name and this time he said "Kelvan [sic] Gesinger."  Id. ¶ 10.  When asked about his activities on Range Unit 23, Mr. Gesinger indicated Riggins[7] sent him

---

[7]Riggins Mortenson was the leader of the eight contract riders.  (Dockets 14-3 ¶ 4 & 23 ¶ 3).

there.  Id.   When the other riders challenged that statement as a lie, Mr. Bourland suggested they visit with Riggins who was still in the building.  Id.  At that point, Mr. Gesinger "recanted and stated 'nobody' and that he acted . . . . [and] denied saying Lonnie Wright had told him to go to the White Wolf range unit."  Id.

Mr. Bourland testified "[t]he BIA did not have a pending case for any compliance violation or trespass on Range Unit 23, allocated to Plaintiffs Sullivan and Michelle White Wolf.  Thus, the BIA would have no reason to impound or round up their horses."  Id. ¶ 11.

Plaintiffs present a different description of the events.  According to Mr. Iron Hawk, on August 15, 2016, Ms. Vine told him the BIA "would hire Riggin Mortenson and his crew to round up the horses."  (Docket 14-3 ¶ 4).  Mr. Iron Hawk received a call from Mr. Mortenson and then on August 16, he and his crew, including Mr. Gesinger, showed up with "a semi truck, horse trailers, and pick up trucks."  Id. ¶ 5.

According to Mr. Iron Hawk, the crew "stampeded the horses, chased them at galloping speeds, and scared and frightened them."  Id. ¶ 6.  He indicated "some of the horses escaped, jumped fence and took off[.]"  Id. ¶ 7.  Mr. Iron Hawk asserted the "crew filled 3 trailers . . . approximately 50 horses, and they were taken to Eagle Butte."  Id. ¶ 8.  Mr. Iron Hawk was

"only able to locate 20 of the horses that were sold by Mortensen."8  Id.  Mr. Iron Hawk said they were "reimbursed for the 20 horses and [sic] a lower rate than what Mortenson received for them.  The remaining horses were never accounted for[.]"  Id.

Then, on August 22, while Mr. Iron Hawk was working in Pierre, South Dakota, his wife called indicating "the BIA was at our Range Unit rounding up horses."  Id. ¶ 10.  When Mr. Iron Hawk met his wife and Mr. Wright at the range unit, Mr. Wright informed the Iron Hawks that "Mortensen's crew was the crew hired by the BIA to execute the round up."  Id. ¶ 11.  Mr. Iron Hawk told Mr. Wright to "get a different crew because Mortenson's crew did not know how to properly handle the horses.  They were too aggressive, reckless and inhumane . . . . [and] also appeared to be under the influence of drugs and or alcohol."  Id. ¶ 12.  Mr. Iron Hawk was told by Mr. Wright that "it was too late[, as] the crew was attempting to get the horses rounded up . . . [from] the land owned by Syllivan [sic] . . . White Wolf and Ted Knife."  Id. ¶¶ 12 & 14.  Mr. Iron Hawk indicates Mr. Geisinger was a member of the Mortenson crew, as he had been with them from the first day.  Id. ¶ 13.

Renee Iron Hawk's affidavit mirrors that of her husband's affidavit in many respects.  See Docket 14-4.  In addition, she indicates having spoken

---

[8] The correct spelling of the rider's name is "Mortenson."  See Docket 7-1 at p. 11.  Except in quoted statements, the court will use the correct spelling.

9

with Mr. Mortenson on August 22.  Id. ¶¶ 10 & 12.  During that discussion, Mr. Mortenson said "they were going to run the horses until they tired out.  He told me they knew what they were doing[.]"  Id. ¶ 12.  According to Mrs. Iron Hawk, the "crew appeared to be under the influence of drugs, with glossy eyes.  They were very hyper and physically aggressive towards the horses."  Id. ¶ 14.

"In the days prior to August 25, 2017 [sic]," Mr. White Wolf "witnessed two horse trailers, several pickups with four wheelers and motorcycles going through my pasture to the Iron Hawk's pasture."  (Docket 14-5 ¶ 9).  On August 25, when Mr. White Wolf and BIA Officer Charging Eagle stopped Mr. Gesinger on Mr. White Wolf's land, Mr. Gesinger told them "that the BIA, including Greg Bourland, Jerry Vine, and Lonnie Wright had hired him and Riggin Mortenson's crew to retrieve the horses from Range Unit 23."  Id. ¶ 7.  Michelle White Wolf's affidavit affirms her husband's affidavit regarding Mr. Gesinger's statement on August 25, 2016.  (Docket 14-6 ¶ 4).

<u>RULE 12(b)(1) MOTION</u>

Rule 12 provides in part that "a party may assert the following defenses by motion: . . . lack of subject-matter jurisdiction . . . ."  Fed. R. Civ. P. 12(b)(1).  "In order to properly dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the complaint must be successfully challenged on its face or on the factual truthfulness of its averments."  Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993) (internal citation omitted).  "In a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed

10

to be true and the motion [to dismiss] is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction." Id. (internal citation omitted). "In a factual attack, the court considers matters outside the pleadings . . . and the non-moving party does not have the benefit of 12(b)(6) safeguards." Osborn v. United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (internal citations omitted).

This case involves a factual attack under a Rule 12(b)(1) motion, that is, a factual challenge to "the trial court's jurisdiction—its very power to hear the case[.]" Id. at 730. In resolving a factual attack "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Id. See also Faibisch v. University of Minnesota, 304 F.3d 797, 801 (8th Cir. 2002) ("When a district court engages in a factual review, it inquires into and resolves factual disputes."). "In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." Osborn, 918 F.2d at 730. Any finding of fact made by the district court is reviewed "under the 'clearly erroneous' standard." Id. (internal citation omitted).

This action is filed pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et. seq.* ("FTCA"). (Docket 1 ¶ 4). Section 1346(b)(1) of Title 28 confers exclusive jurisdiction to the district courts over "civil actions on claims against

11

the United States, for money damages . . . for injury or loss of property, or personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  An '[e]mployee of the government" is defined to "include . . . officers or employees of any federal agency[.]"  28 U.S.C. § 2671.  As used in the FTCA and § 1346(b) "the term 'Federal agency' includes the executive departments . . . but does not include any contractors with the United States."  Id.

"A critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the detailed physical performance of the contractor.' "  United States v. Orleans, 425 U.S. 807, 814 (1976) (citing Logue v. United States, 412 U.S. 521, 528 (1973)).  See also Charlima, Inc. v. United States, 873 F.2d 1078, 1080–81 (8th Cir. 1989) ("The crucial element in determining whether an individual may be considered a federal employee is the amount of control the federal government has over the physical performance of the individual.") (referencing Orleans, 425 U.S. 814-15; Logue, 412 U.S. at 528).

The court finds the eight riders were independent contractors when they signed up for the project of removing horses for Range Unit 152 on August 22, 2016.  Even if the court accepts plaintiffs' recitation of the events of August

12

16, that does not change the court's conclusion. "In a factual attack . . . the non-moving party does not have the benefit of 12(b)(6) safeguards." Osborn, 918 F.2d at 729 n.6. "[T]he existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Id. at 730.

By the contracts for services, each rider was required to supply their own equipment, including "trucks, pickups, all-terrain vehicles, [corral] panels, horses and loading chutes." (Docket 7-1 ¶ 1(d). No BIA employee was expected to tell them how to round up horses or supervise the riders' manner of doing so. While it is unfortunate that one or more of the Iron Hawks' horses may have been injured in the process, BIA personnel were not in the pasture, either on horseback or on an all-terrain vehicle, directing each of the riders on how to move the horses from point A to point B. That task relied upon the judgment and expertise of each rider when gathering the stock. The BIA did not "control the detailed physical performance of the contractor." Orleans, 425 U.S. at 814.

Mr. Gesinger cannot be considered a BIA contractor when he chose to go to Range Unit 23. That range unit was not identified in any of the contracts for service. See Docket 7-1 ¶¶ 1(a) & (b). No BIA personnel instructed him to work on that range unit. Mr. Gesinger acted independently when he went to Range Unit 23. He admitted his free-lance status during the conversation

13

with Mr. Bourland and the five riders.   Mr. Gesinger's actions were not the actions of a federal employee.

Plaintiffs fail to satisfy their "burden of proof that jurisdiction does in fact exist."   Osborn, 918 F.2d at 730.   Defendant's motion to dismiss pursuant to Rule 12(b)(1) must be granted.

DISCRETIONARY FUNCTION EXCEPTION

Alternatively, the government moved to dismiss plaintiffs' complaint under the discretionary function exception of the FTCA.   (Docket 6 at pp. 16-19) (referencing 28 U.S.C. § 2680(a)).

The discretionary function exception provides:

> The provisions of this chapter and section 1346(b) of this title shall not apply to . . . [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).   "The purpose of the exception is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, . . . when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy."   United States v. Gaubert, 499 U.S. 315, 323 (1991) (internal citations and some quotation marks omitted).   See also Hart v. United States, 630 F.3d 1085, 1088 (8th Cir. 2011)

14

("First, the conduct at issue must be discretionary, involving an element of judgment or choice. The second requirement is that the judgment at issue be of the kind that the discretionary function exception was designed to shield.") (internal citation omitted).

"Where no statute or regulation controls the government's monitoring of a contractor's work, the extent of monitoring required or actually accomplished is necessarily a question of judgment, or discretion, for the government." Kirchmann v. United States, 8 F.3d 1273, 1276 (8th Cir. 1993). "If arguably based on policy considerations, both negligence in supervising a contractor and the failure to supervise a contractor at all are included in the decisions protected by the discretionary function exception." Id. at 1277.

Plaintiffs contend the BIA employees supervising the contract riders were required to comply with Topic 14 of the *Bureau of Indian Affairs Safety and Health Handbook for Field Operations* ("Safety and Health Handbook"). (Docket 14 at p. 5). Additionally, plaintiffs assert the BIA was required "to notify the contractor to take corrective action whenever it becomes aware of a serious or imminent danger to the health or safety of the public." Id. at p. 6 (referencing 48 C.F.R. 52.2365-13(a)).

Plaintiffs argue the Iron Hawks observed safety and health violations on August 16 because of "the dereliction of the contractors . . . being under the influence of alcohol or drugs, chasing the horses at galloping speed, trying to tire the horses out, cutting the fences, causing the horses to go through fences,

15

injuring the horses, and failing to account for 20 head of the Iron Hawk horses." Id. Plaintiffs submit the same thing occurred on August 22. Id. Plaintiffs argue "[s]upervision is not protected under the FTCA if it pertains to operational level conduct." Id. at p. 3 (referencing Tonelli v. United States, 60 F.3d 492, 496 (8th Cir. 1995); other references omitted). They assert that "[s]upervision of government contractors are governed under similar principles as supervision of employees." Id. at p. 4 (referencing Brown v. United States, 374 F. Supp. 723, 729 (E.D. Ark. 1974), *on remand from* 486 F.2d 284 (8th Cir. 1973); other references omitted). Plaintiffs argue "the kind of decision that should have been made in this case is operational and not the kind of judgment that the discretionary function exception was designed to shield. Policy decisions are not invoked by the facts of this case, but rather science of animal husbandry and principles of humane treatment of animals." Id. at p. 7.

It is clear by the language of Topic 14 of the Safety and Health Handbook that the section applies to contracts involving "hazardous substances" and "hazardous materials" but not to rounding up horses on leased land. See Docket 14-1 at p. 4 ¶¶ 14.2(A)(1) & (2). Topic 14 is not relevant to the contracts involved in this case. Similarly, 48 C.F.R. 52.236-13 is not relevant to this case. That section of the Code of Federal Regulations applies to "contracts for construction or dismantling, demolition, or removal of improvements . . . ." 48 C.F.R. 52.236-13(b).

16

In <u>Tonelli</u>, the supervision in question revolved around a postal employee's duty to report theft of mail by another postal employee. The court concluded that "[f]ailure to act after notice of illegal action does not represent a choice based on plausible policy considerations." <u>Tonelli</u>, 60 F.3d at 496. For that reason, plaintiffs survived summary judgment on their "employee supervision and retention claims." <u>Id.</u> But the court rejected plaintiffs' negligent hiring claim. "The post office's choice between several potential employees involves the weighing of individual backgrounds, office diversity, experience and employer intuition. These multi-factored choices require the balancing of competing objectives, and are of the nature and quality that Congress intended to shield from tort liability." <u>Id.</u> (internal citation and quotation marks omitted).

The Iron Hawks allege Mr. Mortenson and his crew "fail[ed] to account for 20 head of the Iron Hawk horses." (Docket 14 at p. 6). That allegation is premised on Mr. Iron Hawk's affidavit.

> Mortenson and his crew filled 3 trailers of horses during this round up, approximately 50 horses, and they were taken to Eagle Butte. We were only able to locate 20 of the horses that were sold by Mortenson. We were reimbursed for the 20 horses and a lower rate than what Mortenson received for them. The remaining horses were never accounted for or located.

(Docket 14-3 ¶ 8; <u>see also</u> Docket 14-4 ¶ 8).

17

Each of the contracts for services required the riders to be "responsible for providing all equipment required for the round up and delivery of said horses to the Philip Sale Barn located in Philip, South Dakota."  (Docket 7-1 ¶ 1(c)).  Nothing in their contract relationship with the BIA authorized Mr. Mortenson or any other rider to deliver the horses to the Eagle Butte, South Dakota, sale barn or sell the Iron Hawks' horses and take the money.  If that conduct occurred, it was outside the BIA contract and may constitute conversion or theft.  There is nothing in this record which would have led the BIA to believe any one or more of the contract riders would engage in criminal conduct.  Without notice prior to the alleged illegal conduct, the government cannot be held responsible for the subsequent criminality.  Tonelli, 60 F.3d at 496 (8th Cir. 1995).

Plaintiffs' reliance on Brown and the other cases referenced in their brief are not applicable to the case before the court.  In Brown, the court was faced with the Bureau of Prison's authority under 18 U.S.C. § 4002 to place federal prisoners in state-run facilities.  That section "confers upon the Bureau of Prisons discretion to contract with a particular local political subdivision for the confinement of federal prisoners in a local jail."  Brown, 374 F. Supp. at 728 (referencing 18 U.S.C. § 4002).  "But . . . section 4002 must be read in conjunction with and in subordination to section [18 U.S.C. §] 4042 which imposes upon the Bureau a positive duty to use care for the safety of all federal prisoners . . . regardless of whether they are confined in federal institutions or

18

whether they are confined in State or local jails or penal institutions." Id. at 728-29. With that analysis, the Brown court concluded "the Government, acting through the Bureau of Prisons, is required to use ordinary care in choosing its contractors and in determining whether federal prisoners should be kept in a particular facility, and that the governmental functions performed in those areas are not 'discretionary functions' with respect to which the Government is immune from tort liability by virtue of section 2680(a)." Id. at 729.

In the present case, there is no statute or regulation directing the BIA to contract with riders possessing certain qualifications. Rather, the government is left to its own discretion to contract with riders the BIA believes are qualified to perform the tasks at hand.

> A discretionary act is one that involves choice or judgment; there is nothing in that description that refers exclusively to policymaking or planning functions. Day-to-day management . . . regularly requires judgment as to which of a range of permissible courses is the wisest. Discretionary conduct is not confined to the policy or planning level. It is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case.

Gaubert, 499 U.S. at 325 (internal citation, quotation marks and brackets omitted). The Supreme Court concluded the use of the term "operational" in earlier decisions "perpetuat[ed] a nonexistent dichotomy between discretionary functions and operational activities." Id. at 326. "[O]nce the [lower] court determined that some of the actions challenged . . . occurred at an operational

19

level, it concluded, incorrectly, that those actions must necessarily have been outside the scope of the discretionary function exception."  Id.

The court finds that the BIA's contracting with the riders in this case falls within the discretionary function exception.  28 U.S.C. § 2680(a).  "[T]he conduct at issue . . . [was] discretionary, involving an element of judgment or choice."  Hart, 630 F.3d at 1088.  "[T]he judgment at issue" was "of the kind that the discretionary function exception was designed to shield."  Id.; see also Gaubert, 499 U.S. at 325.  The government's alternate Rule 12(b)(1) motion is granted.

## ORDER

Based on the above analysis, it is

ORDERED that the defendant's motion to dismiss (Docket 5) is granted.

IT IS FURTHER ORDERED that plaintiffs' complaint (Docket 1) is dismissed with prejudice.

Dated August 24, 2020.

        BY THE COURT:

        /s/ *Jeffrey L. Viken*
        JEFFREY L. VIKEN
        UNITED STATES DISTRICT JUDGE